# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JIM SMIETANA and RITA MALAVOTTE, on behalf of themselves and a class of persons similarly situated,

Plaintiff,

-against-

MARSH & MCLENNAN COMPANIES, INC., PATRICIA A. AGNELLO, WILLIAM L. ROSOFF, SANDRA S. WIJNBERG, GREGORY F. VAN GUNDY, J.W. GREENBERG, SANDRA WRIGHT, NORMAN BARHAM, FRANK J. BORELLI, RAY J. GROVES, A.J.C. SMITH, PETER COSTER, JOHN T. SINOTT, FRANK J. TASCO, CHARLES A. DAVIS, MATHIS CABIALLAVETTA, MARSH & MCLENNAN COMPANIES, INC. BENEFITS ADMINSITRATION COMMITTEE, MARSH & MCLENNAN COMPANIES, INC. STOCK INVESTMENT PLAN COMMITTEE and FRANCIS N. BONSIGNORE,

Defendants.

Case No.

05 CV 944

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITIES ACT

---

For their Complaint against Defendants, Plaintiffs Jim Smietana and Rita Malavotte allege as follows:

## I.   NATURE OF ACTION

1.      This is a civil enforcement action brought pursuant to §502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132.

2.      The lawsuit concerns both the Marsh & McLennan Putnam Investments Profit Sharing Retirement Plan and the Marsh & McLennan Companies Stock Investment Plan (the

"Plans") established by the Marsh & McLennan Companies, Inc., ("MMC" or the "Company") as benefits for its employees as profit-sharing plans under Section 401(k) of the Internal Revenue Code (the "Code"). The Plans are subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

3.     Plaintiffs sue Patricia A. Agnello, William L. Rosoff, Sandra S. Wijnberg, Gregory F. Van Gundy and Francis N. Bonsignore, who are or were the trustees and directors of the Plans and the directors and/or officers of the Company; and the Company.

4.     Plaintiffs were employees of Marsh & McLennan and participants in the MMC Plans during the Class Period. Plaintiffs' retirement investment portfolio included Marsh & McLennan stock during the Class Period.

5.     Plaintiffs are former employee of MMC and participants in a Plan. Plaintiffs allege that Defendants, MMC itself and certain individuals, are fiduciaries of the Plans, and breached their fiduciary duties to him and to the other participants and beneficiaries of the Plans, in violation of ERISA §409, 29 U.S.C. §1109, in connection with the Plans' holdings of MMC stock. Plaintiff alleges that Defendants are obliged under ERISA to make the Plans whole for the losses suffered as a result of Defendants' failure to discharge their fiduciary obligations.

6.     Because Plaintiffs' claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes a participant to sue for plan-wide relief for breaches of fiduciary duty, she brings this action on behalf of herself and all the participants and beneficiaries of the Plans during the relevant period.

## II.  JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal questions) and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1), and personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k).

8.     Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Defendant MMC maintains its corporate headquarters in this District.

### III.   PARTIES

**Plaintiff**

9.     Plaintiff Jim Smietana is a resident of New Jersey and is a former employee of MMC.

10.    Plaintiff Rita Malavotte is a resident of Arizona and is a former employee of MMC.

11.    Plaintiffs were each a "participant" in a Plan within the meaning of ERISA § 3(7) 29 U.S.C. § 1002(7). During the Class Period, Plaintiffs' interest in the Plans included investments in MMC common stock.

**Defendants**

12.    Marsh & McLennan is a fiduciary of the Plans within the meaning of ERISA. Marsh & McLennan exercises discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets. Marsh & McLennan at all times acted through its officers and employees, including its Chief Executive Officer ("CEO") and members of its Board oversight and/or Plan administrative committees appointed by the Company to perform MMC's Plan-related fiduciary functions in the course and scope of their employment.

13.    Defendant MMC is a Delaware corporation with its principal place of business located at 1166 Avenue of the Americas, New York, New York 10036. The Company, according to its website: www.mmc.com, is a global professional services firm with annual

3

revenues exceeding $11 billion.   The company is active in the following sectors: risk and insurance services, investment management and consulting

14.     Marsh & McLennan had, at all applicable times, effective control over the activities of its officers and employees, including over their activities in the Plans.  Marsh & McLennan, through its Board of Directors, Executive Officers or otherwise, had the authority and discretion to hire and terminate said officers and employees.  Marsh & McLennan, through its Board and otherwise, also had the authority and discretion to appoint, monitor, and remove Directors, Officers and other employees from their individual fiduciary roles with respect to the Plans.  By failing to properly discharge their fiduciary duties under ERISA, such Defendant-fiduciaries breached duties they owed to Participants in the Plans and their beneficiaries. Accordingly, the actions of these fiduciaries are imputed to Marsh & McLennan under the doctrine of respondeat superior, and Marsh & McLennan is liable for such actions.

15.     Defendant Patricia A. Agnello, ("Agnello") is the Delegate of Benefits Administration Committee Plan Administrator for Putnam Investments Profit Sharing Retirement Plan. Upon information and belief, Agnello was a fiduciary of a Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets. Agnello participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form 11-K relating to the Plan's annual report which was issued to Plan participants.

16.     Defendant Francis N. Bonsignore ("Bonsignore") is a trustee of a Plan. Defendant Bonsignore is Senior Vice President – Executive Resources & Development of MMC. Upon information and belief, Bonsignore is a fiduciary of the Plan within the meaning of ERISA

in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

17.    Defendant Sandra S. Wijnberg ("Wijnberg") is a trustee of both Plans, Chairperson of the Stock Investment Plan Committee, Senior Vice President and Chief Financial Officer of the Company. Upon information and belief, Wijnberg was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

18.    Defendant William S. Rosoff ("Rosoff") was during a time relevant hereto a Trustee and Senior Vice President and General Counsel of MMC. Upon information and belief, Rosoff was a fiduciary of a Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

19.    Defendant Gregory F. Van Gundy ("Van Gundy") was during a time relevant hereto a trustee of a Plan. Upon information and belief, Van Gundy was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

**Director Defendants**

20.    Defendant J.W. Greenberg ("Greenberg") served as Chairman of the Board and Chief Executive Officer ("CEO") of Marsh & McLennan during the Class Period. Greenberg was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary

authority with respect to management and administration of the Plans and/or management and disposition of the Plan's asset.

21.     Defendant Norman Barham ("Barham") served on MMC's Board of Directors ("Board") during the Class Period.  Barham was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

22.     Defendant Frank J. Borelli ("Borelli") served on the Board during the Class Period.  Borelli was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

23.     Defendant Ray J. Groves ("Groves") served on the Board during the Class Period.  Groves was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

24.     Defendant A.J.C. Smith ("Smith") served on the Board during the Class Period.  Smith served as Chairman of the Board of MMC from 1992 until his retirement in 2000 and was Chief Executive Officer of MMC from 1992 until 1999.  Smith was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

25.     Defendant Peter Coster ("Coster") served on the Board during the Class Period.  Coster was a fiduciary of the Plans within the meaning of ERISA in that he exercised

discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

26.     Defendant John T. Sinnot ("Sinnott") served on the Board during the Class Period.  Sinnott was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

27.     Defendant Frank J. Tasco ("Tasco") served on the Board during the Class Period.  Tasco was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

28.     Defendant Mathis Cabiallavetta ("Cabiallavetta") has served on the Board since 2000.  Cabiallavetta was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

29.     Defendant Charles A. Davis ("Davis") was elected to the Board in 2000.  Davis was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

**Committee Defendants**

30.     Defendants Marsh & McLennan Companies, Inc. Benefits Administration Committee ("Administration Committee") is a Plan Administrator and has discretionary authority to control and manage the operation and administration of the Plan.  Defendant Marsh & McLennan Companies, Inc. Stock Investment Plan Committee ("Plan Committee") is a named fiduciary of a Plan.

31.     The Defendants referred to in paragraphs 14-28 are collectively referred to herein as the "Individual Defendants."

32.     Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith.

### IV.   APPROPRIATENESS OF CLASS ACTION

33.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and a class (the "Class") of all persons similarly situated. The Class itself consists of all persons who were participants in or beneficiaries of either Plan at any time from November 3, 1998 through the present (the "Class Period").  Excluded from the Class are defendants, directors of the Company, at time relevant hereto, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

34.     Plaintiff meets the prerequisites to bring this action on behalf of the Class because:

> •     **Numerosity.**  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes the Class consists of thousands of individuals and is so numerous that joinder of all members as individual Plaintiffs is impracticable.

Plan participants and beneficiaries may be identified from records maintained by the Company or the Plan's trustee and may be notified of the pendency of this action by mail.

- **Commonality.**  There are questions of law and fact common to the Class such as:

    1.  Did defendants breach their fiduciary duties owed to Plan participants and beneficiaries?

    2.  Did defendants' communications to participants provide complete and accurate information concerning the risks of investing in Company stock?

    3.  Did defendants provide false and misleading information, or fail to disclose material information, concerning the financial health of the Company?

    4.  What steps, if any, did defendants take to investigate and monitor whether it was appropriate to continue to offer Company stock as a retirement vehicle for Plan participants?

    5.  Did defendants take adequate steps to protect the Plan and recover Plan damages?

- **Typicality.**  Plaintiffs' claims are typical of the claims of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein and defendants' breach of fiduciary duty.

- **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that are antagonistic to or in conflict with the interest of the Class as a whole, and has engaged competent counsel, highly experienced in ERISA class actions concerning employer securities in 401(k) plans, as well as in other class and complex litigation, to ensure protection of the interests of the Class as a whole.

35. As an ERISA breach of fiduciary duty action for plan-wide relief, this is a classic Rule 23(b)(1)(B) class action. The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical mater, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. However, this action is also maintainable as a class action under the other subsections (b) of Rule 23:

- **Rule 23(b)(1)(A).** The prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants.

- **Rule 23(b)(2).** The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

- **Rule 23(b)(3).** Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient

adjudication of the controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them and there will be no difficulty in the management of this action as a class action.

36.     There are one or more putative or certified class action securities cases pending against MMC and other Defendants. The claims herein are under ERISA and related principles of federal common law and are not being asserted by the plaintiffs in those other class actions. The named plaintiffs in those class actions do not adequately represent the plaintiff or the Class herein with respect to ERISA claims and may be subject to defenses and limitations of liability under the PSLRA and other statutes and Rules that do not apply to the claims asserted herein.

37.     Under and required by ERISA, Defendants carry insurance for claims asserted herein that may not be available to the Defendants in the securities class actions.

38.     The Class contains persons who made purchases within the time frame implicated in the securities class actions, as well as persons who made no purchases within the Class Period for the securities actions, and persons who purchased both within and outside the securities class action time frame.

39.     There are people in this Class who are not members of the classes or putative classes in the securities class action cases.

40.     There are Defendants in this case who are not Defendants in the securities class actions.

## V.     THE PLANS

41.     The Marsh & McLennan Putnam Investments Profit Sharing Retirement Plan is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C.

§1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k).   The Plan is not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plan.

42.    MMC is the sponsor and administrator of the Plan.   Its Sponsor Identification Number is 36-2668272.

43.    There are fiduciaries of the Plan whose identities are currently unknown to Plaintiff, including members of the various fiduciary committees.   Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

44.    According to MMC's Form 11-K annual report filed with the SEC for fiscal year ended December 31, 2003, on June 28, 2004:

> The Plan is a defined contribution plan sponsored by Putnam Investments LLC ("Putnam") and its subsidiaries (the "Company"). Putnam is a wholly owned subsidiary of Putnam Investments Trust, which is ultimately a majority-owned subsidiary of Marsh & McLennan Companies, Inc. ("MMC"). The Plan is for the benefit of the Company's employees and is intended to qualify as a profit-sharing plan under Section 401(a) of the Internal Revenue Code (the "Code") and to constitute a qualified cash or deferred arrangement under Section 401(k) of the Code. The Plan document was amended on November 18th, 2003 to identify the Benefits administration committee of MMC as the Plan administrator. The Plan document was also amended and restated on January 1, 2001 to comply with the applicable provisions of tax acts referred to as GUST. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").
>
> An employee is eligible to become a participant under the profit-sharing portion of the Plan upon the completion of 12 months of service. An employee is eligible to become a participant in the salary-deferral portion of the Plan upon commencement of employment. A participant must be employed on the last day of the Plan's fiscal year (December 31) to be eligible for his or her portion of the Company's contribution for that year.
>
> Contributions -- Company contributions are determined at the discretion of the Company's Board of Directors. Contributions may not exceed the

amount permitted as a deduction under the applicable provisions of the Code. During the years ended December 31, 2003 and 2002, the Company contributed 15% of eligible compensation.

It is the intention of the Trustees that the salary deferral portion of the Plan be qualified under Section 401(k) of the Code. The terms of the salary savings agreement provide that the participants' earnings contribution to the Plan will be deducted from their payroll and that the Company shall contribute this amount to the Plan on behalf of the participants. Unless otherwise directed by the employee, all new employees contribute 3% of their total earnings to the salary-deferred portion of the Plan. The market value of assets relating to the salary savings program at December 31, 2003 and 2002 was $115,778,720 and $83,898,552, respectively.

Voluntary employee contributions are accepted within certain limits as defined in the Plan. Participants making contributions are not allowed to withdraw any appreciation on such contributions before termination of employment but may withdraw their contributions subject to certain restrictions.

Investment Programs -- The Plan allows each participant to elect to have participant contributions, Company contributions and reallocated forfeitures invested in one or more of the following authorized investment vehicles:

(1)     Any one or a combination of the open-end management investment companies, excluding tax-exempt income funds, for which a subsidiary of Putnam acts as an investment adviser ("Putnam-sponsored mutual funds").

(2)     Prior to January 1997, any one or a combination of contracts with insurance companies which guarantee principal and interest at a fixed rate. Subsequent to January 1997, guaranteed investment contract products are offered through the investment in the Putnam Fiduciary Trust Company Stable Value Fund.

(3)     MMC common stock (MMC is the parent company of Putnam).

(4)     Other investment options approved by the Board of Directors of Putnam, the trustees of the Plan (the "Trustees"), and the chief executive officer of MMC. There were no investments in this option at December 31, 2003 or 2002.

45.     Most of these options were Putnam diversified mutual funds. However, one of the options included MMC Stock. Contributions to the ESOP portion of the Plan were automatically invested in common stock of the Company.

13

46.    The Marsh & McLennan Companies Stock Investment Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The MMC Plan is a legal entity which can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a Plaintiff or Defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action Plaintiff, who is described above, seek relief on behalf of the Plan.

47.    As noted above, Marsh & McLennan is the Sponsor of the Marsh & McLennan Companies Stock Investment Plan. While Putnam is the Putnam Plan Sponsor, Marsh & McLennan and its Officers and Directors are intimately involved in the administration of the Putnam Plan and investment of Putnam Plan assets. For example, the Senior Vice President and General Counsel of MMC is the Plan Administrator for Putnam. Consequently, it is simply irrefutable that at least those Defendant-fiduciaries who were also charged with the management and/or administration of the Putnam Plan did not know that such Putnam Plan asset – Marsh Stock held by the Putnam Plan – were materially at risk due to the business improprieties occurring at MMC described herein.

48.    Under the Plan, participants may contribute through payroll deductions from 1% to 15% of their salary, on a before and/or after-tax basis.

49.    According to the 2003 Form 11-K, prior to August 1, 2003, all employee contributions and Company matching contributions were invested in the MMC Stock Fund unless the participants' age was 55 or older or their age plus years of plan participation equaled at least 65. These participants could then diversify their present and future contributions and accumulated account balances among the MMC Stock Fund, a fixed income fund, and various

Putnam mutual funds.  For all participants, MMC's matching contributions were invested in the same manner as the participants' contributions.

50.     However, beginning August 1, 2003, the Plan was reopened to full participant contribution elections and direction, allowing participants to direct their contributions into one or more of 17 investment options.[1]

51.     Employees are vested immediately in their contributions.  For employees hired on and after January 1, 1998, participants vest in Company matching contributions according to the following schedule:  33% in such contributions after three years of service, 67% after four years of service, and 100% after five years of service.

52.     In addition, according to the 2003 MMC Form 11-K, as of June 30, 2003, the fair value of Company common stock held by the Plan was valued at $1,478,910,237.

53.     The Marsh & McLennan stock held by the Plan was materially inflated at all times during the Class Period as a result of the Company's failure to disclose that the a substantial portion of its revenue was based on "contingent commissions" whereby the Company would be paid to steer business to those that paid said commission and away from those that chose not to engage in such business shenanigans.

## VI. **DEFENDANTS' FIDUCIARY STATUS**

54.     During the Class Period, the Defendants had discretionary authority respecting management of the Plans and/or the management or disposition of the Plans' assets and had discretionary authority or responsibility for the administration of the Plans.

---

[1]  Participants age 55 or older, or whose age plus years of plan participation equals at least 65, are not required to invest their Company match in the same funds as their contributions.  All other participants are required to invest their Company match in the MMC Stock Fund.

55.    During the Class Period, all of the Defendants acted as fiduciaries of a Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) and the law interpreting that section.

56.    ERISA requires every plan to provide for one or more named fiduciaries, who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Instead of delegating fiduciary responsibility for the Plan to external service providers, the Company chose to comply with the requirement of section 402(a)(1) by internalizing the fiduciary function.  It did so in various ways.

57.    First, during the Class Period, the Company designated Benefits Administration Committee as Plan administrator, thereby making the members of that committee named fiduciaries of the Plan.

58.    Second, ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under Section 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions. ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets. . . ." During the Class Period, the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, appointing Plan administrators and making statements to participants with respect to the Company, its financial results and business prospects.

59.    Further, MMC and the Individual Defendants performed fiduciary functions by communicating with Plan participants with respect to the Plans, including, without limitation, through Plan Prospectus' and periodic SEC reports.

60.     In addition, under ERISA, in various circumstances non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the fiduciary breaches described below.

## VI.     FACTUAL BACKGROUND TO BREACHES OF FIDUCIARY DUTY

61.     MMC, through its subsidiary Marsh Inc., is the largest provider of insurance brokerage and consulting services in the world.  Clients, including business and individuals, retain Marsh to assist them in designing an insurance plan and negotiation with insurance companies to get the optimal mix of coverage, service, financial security and price.

62.     During the Class Period, MMC touted itself as experiencing outstanding, sustainable growth, and as continuing to demonstrate positive results.  However, during the Class Period, MMC engaged a plan whereby MMC steered business toward companies, and shielded such companies from competition, in exchange for so-called "contingent commissions."  This arrangement created improper incentives for MMC to steer business towards those businesses that were, in effect, providing kickbacks to MMC.

63.     Marsh markets itself to clients as a trusted expert in the analysis and placement of insurance policies.  However, during the Class Period, Marsh engaged a plan whereby Marsh steered business toward companies, and shielded such companies from competition, in exchange for so-called "contingent commissions."  This arrangement created improper incentives for Marsh to steer business towards those businesses that were, in effect, providing kick-backs to Marsh.

64.     During the Class Period, Marsh entered into a campaign of bid-rigging purported competitive insurance solicitations, made on behalf of clients, to insure that companies involved in Marsh's illicit commission scheme were able to obtain insurance and services contracts at

inflated prices.  To carry out this scheme, Marsh presented clients with fictitious high quotes from insurance companies to create the appearance that fair bidding amongst insurance providers was occurring.  In reality, this assured that Marsh could execute insurance contracts at rates that they would otherwise be unable to obtain in a freely competitive market.

65.     Marsh's scheme was phenomenally profitable. For example, it reported that for its fiscal year 2003, approximately $800 million of Marsh's earnings were attributable to contingent commission payments. That year, Marsh overall reported approximately $1.5 billion in net income. Marsh has never disclosed to its shareholders how contingent commissions constitute the lifeblood of its business. To the contrary, during an analyst conference call on July 28, 2004, defendant Greenberger stated, "We don't break out contingent commissions. That is not separately enumerated because it is part of our business model."

66.     On October 14, 2004, the Attorney General of the State of New York, Eliot Spitzer, announced that as a result of an intensive investigation, the Office of New York State Attorney General had commenced a civil action in relation to the alleged conduct set forth herein.   Moreover, Attorney General Spitzer announced that two executives at American International Group, Inc. ("AIG") had pleaded guilty to criminal charges arising out of the scheme.  The press release announcing the initiation of the action, stated, as follows:

> INVESTIGATION REVEALS WIDESPREAD CORRUPTION IN INSURANCE INDUSTRY
>
> Leading Brokerage Firm Sued for Fraud and Antitrust Violations; Insurance Company Executives Plead Guilty; Major Insurance Firms Implicated
>
> Attorney General Eliot Spitzer today sued the nation's leading insurance brokerage firm, alleging that it steered unsuspecting clients to insurers with whom it had lucrative payoff agreements, and that the firm solicited rigged bids for insurance contracts.

Simultaneously, Spitzer announced that two insurance company executives have pleaded guilty to criminal charges in connection with the scheme.

The actions against the brokerage firm, Marsh & McLennan Companies, and the two executives stem from a widening investigation of fraud and anti-competitive practices in the insurance industry. Evidence revealed in today's lawsuit also implicates other major insurance carriers.

"The insurance industry needs to take a long, hard look at itself," Spitzer said. "If the practices identified in our suit are as widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform."

"There is simply no responsible argument for a system that rigs bids, stifles competition and cheats customers," he added.

Spitzer was joined at news conference announcing the actions by New York State Insurance Superintendent Gregory V. Serio, who said: "This has gone from an inquiry into failure to disclose compensation to an active investigation of bid rigging and improper steering. This certainly proves the adage that where there is smoke, there is fire."

The civil complaint filed today in State Supreme Court in Manhattan alleges that for years Marsh & McLennan received special payments from insurance companies that were above and beyond normal sales commissions. These payments -- known as "contingent commissions" -- were characterized as compensation for "market services" but were, in fact, rewards for the business that Marsh & McLennan and its independent brokers steered and allocated to the insurance companies. Industry representatives defend this long-standing practice as acceptable and even beneficial to clients, but the Attorney General's office has uncovered extensive evidence showing that it distorts and corrupts the insurance marketplace and cheats insurance customers.

In addition to steering business to its insurance company partners, Marsh, at times, solicited fake bids, which deceived its customers into thinking that true competition had taken place. Marsh & McLennan did this even as it claimed in public statements that its "guiding principle" was to always consider its client's best interests.

Spitzer's complaint against the company cites internal communications in which executives openly discuss actions that

were aimed at maximizing Marsh & McLennan's revenue and insurance companies' revenues -- without regard to clients' interests.

For example, one senior Marsh & McLennan executive sent a message to colleagues saying: "We need to place our business in 2004 with those [insurance companies] that have superior financials, broad coverage and pay us the most."

Another executive noted that the size of contingent commissions will determine "who [we] are steering business to and who we are steering business from."

*     *     *

The two executives pleaded guilty to participating in the illegal conduct and are expected to testify in future cases.

According to the complaint, Marsh & McLennan collected approximately $800 million in contingent commissions in 2003. Spitzer's civil complaint seeks an end to the steering and bid rigging, disgorgement of improper payments, restitution and punitive damages.

67.     On October 19, 2004, Bloomberg issued an article entitled "Spitzer's MMC Probe

Focuses on Reinsurance Business, WSJ Says."  The article stated in part:

New York State Attorney General Eliot Spitzer's probe of MMC Corp., the world's second-biggest insurance broker, spotlights the industry practice of insurance companies buying insurance policies, the Wall Street Journal said in its "Tracking the Numbers" column.

Spitzer's office is investigating whether the Chicago-based company directed business to insurance companies in return for so-called reinsurance business for itself, the paper said, citing people familiar with the matter.  The reinsurance business, or insurance policies for insurance companies, is the focus of the probe, because Spitzer suspects MMC's insurance-buying clients may not have received the best deal, the paper said.

Last week, MMC said that soliciting fake price quotations, bid rigging and accepting payments from insurers for not shopping the business around "would violate MMC policies," and it believes its employees have not done so, the Journal said.

68.     On these revelations, the Company's shares fell to $24.10 from $46.13, a drop of

52%, and more than an 82% drop from its Class Period trading high of $134.88.

69.     On October 15, 2004, after the close of the trading day, MMC issued a press

release announcing that it would no longer collect "contingent commissions."  The press release

stated in pertinent part:

> Marsh & McLennan Companies, Inc. (MMC) announced today that Marsh
> Inc., its risk and insurance services subsidiary, will immediately suspend
> its practice of market services agreements (MSA) with insurance carriers.
>
> Today's decision was made in light of the serious allegations and questions
> that have been raised about this long-standing industry practice.
>
> Jeffrey W. Greenberg, chairman and chief executive officer of MMC, said
> today: "We are greatly disturbed by the allegations of wrongdoing. We
> take them very seriously, and we are conducting a thorough investigation
> of these allegations. As the facts are being reviewed, we believe it is in the
> best interest of our clients to suspend MSAs immediately."

70.     During the Class Period, Plan fiduciaries knew or should have known, that the

Company was paying illegal and concealed "contingent commissions" pursuant to illegal

"contingent commission agreements;" that violated applicable principles of fiduciary law,

subjecting the Company to enormous fines and penalties totaling potentially tens – if not

hundreds – of millions of dollars.

71.     Plan fiduciaries knew, or should have known, that this business practice was

unsustainable and that during the Class Period, the value of the Company's stock was based on

financial results dependent on these unsustainable business practices.

72.     In short, by no later than the beginning of the Class Period, MMC and the

Individual Defendants knew, or should have known, that MMC's stock was a highly

inappropriate investment for a long-term retirement savings plan such as the Plan because of the

scheme described above and other questionable business practices.   Despite this knowledge,

Defendants continued to offer MMC's stock as a Plan investment alternative, continued to cause

MMC matching contributions to be invested in MMC stock, and failed to impute their full

knowledge of the Company's operations on Plan participants so that the Plan participants could

make an informed decision concerning their Plan investments in Company stock.

## VII.   CLAIMS FOR RELIEF

73.       ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)) imposes on a plan fiduciary a

duty of loyalty – that is, a duty to "discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing

benefits to participants and its beneficiaries. . . ." Section 404(a)(1)(B) (29 U.S.C.

§ 1104(a)(1)(B)) also imposes on a plan fiduciary a duty of prudence – that is, a duty to

"discharge his duties with respect to a plan solely in the interest of the participants and

beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man, acting in a like capacity and familiar with such matters would use

in the conduct of an enterprise of a like character and with like aims . . . ."

74.       A plan fiduciary's duties of loyalty and prudence includes a duty to disclose and

inform. This duty entails: (1) a negative duty not to misinform; (2) an affirmative duty to inform

when the fiduciary knows or should know that silence might be harmful; and (3) a duty to

convey complete and accurate information material to the circumstances of participants and

beneficiaries. This duty to disclose and inform recognizes the disparity that may exist, and in this

case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the

participants and beneficiaries, on the other. In a plan with various funds available for investment,

this duty to inform and disclose also includes: (1) the duty to impart to plan participants material

information of which the fiduciary has or should have knowledge that is sufficient to apprise the

average plan participant of the risks associated with investing in any particular fund; and (2) the duty not to make material misrepresentations.

75. By no later than the commencement of the Class Period, Defendants breached their fiduciary duties to disclose and inform with respect to the Plan's use of employer stock as a plan investment. During the Class Period, and before, any investment in employer stock in the Plan was an undiversified investment in a single company's stock. As a result, any such investment carried with it an inherently high degree of risk. These inherent risks made Defendants' duty to provide complete and accurate information about investing in company stock even more important than would otherwise be the case. Rather than providing complete and accurate information to the Plan's participants and beneficiaries regarding the risks of investing in company stock in the Plan, Defendants did the opposite: they withheld and concealed material information during the Class Period and before, and instead actively misled the participants and beneficiaries of the Plan about the appropriateness of investing in company stock and about Defendants' earnings prospects and business condition, thereby encouraging participants and beneficiaries of the Plan to continue to make and to maintain substantial investments in company stock in the Plan.

76. A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of all the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan. Defendants breached this duty of investigation and monitoring with respect to company stock. By no later than the beginning of the Class Period, Defendants could not have reasonably made a determination that company stock was a suitable investment for the Plan, either for a participant's discretionary account or for the match. In fact, by the beginning

23

of the Class Period, if not before, company stock was plainly an unsuitable investment option for the Plan.

77.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

78.     Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by continuing to allow company stock as a Plan investment during the Class Period, by failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in company stock and the information provided to participants and beneficiaries concerning it, and, generally, by failing to take whatever steps were necessary to ensure that the fiduciary of the Plan did not suffer from a conflict of interest.

79.     A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary, including a plan sponsor-fiduciary, may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(d) (29 U.S.C. § 1104(a)(1)(D)).

80.     To the extent that Defendants followed the direction of the Plan documents, for example, in continuing to place the match in company stock during the Class Period, beginning no later than the matches of November 1, 1998, they further breached their fiduciary duties.

## VIII.  CAUSATION

81.     The Plans suffered a loss, and Plaintiff and the other Class members were damaged, because substantial assets in the Plans were invested in company stock during the Class Period in violation of Defendants' fiduciary duties.

82.    As fiduciaries, Defendants were responsible for the prudence of investments in the Plan during the Class Period unless participants in the Plans themselves exercised effective and informed control over the assets in the Plan in its individual accounts pursuant to ERISA § 404(c) and the regulations promulgated under it.  Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure and regulatory compliance, Defendants did exactly the opposite.  As a consequence, participants in the Plan did not control the Plan assets that were invested in company stock, and Defendants remained entirely responsible for ensuring that such investments were and remained prudent.  Defendants' liability to the Plan for damages stemming from imprudent Plan investments in company stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon Defendants' statements, acts, or omissions.

83.    The Plans also suffered a loss, and Plaintiff and the other Class members were damaged, by Defendants' above-described conduct during the Class Period and before, because Defendants' materially deceptive statements, acts, and omissions were fundamentally designed to deceive Plaintiff and the other Class members about the prudence of making and maintaining investments in company stock.  Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a mater of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, Defendants' above-described statements, acts, and omissions constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in company stock and were

material to any reasonable person's decision about whether or not to invest or maintain any part of its plan assets in company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on Defendants' deceptive statements, acts, and omissions.

84.    Plaintiff further contends that the Plans suffered losses, and Plaintiff and the other Class members were damaged, by Defendants' above-described conduct during the Class Period and before, because that conduct fundamentally deceived Plaintiff and the other Class members about the prudence of making and maintaining investments in company stock, and that, in making and maintaining investments in company stock, Plaintiff and the other Class members relied to their detriment upon Defendants' materially deceptive statements, acts, and omissions.

## IX.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

85.    ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2)) authorizes a plan participant to bring a civil action for appropriate relief under section 409 (29 U.S.C. § 1109). Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

86.    With respect to the calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

equitable relief, reasonable attorney fees and expenses, taxable costs, interest, and any other relief the Court deems just.

**Dated:**   January 26, 2005

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**

By:   _____

Mark C. Rifkin (MR 0904)
Christopher Hinton (CH 0759)
270 Madison Avenue
New York, New York  10016
(212) 545-4600 (t)
(212) 545-4563 (f)

*Counsel for Plaintiff*

390762